_____
)
**DEREK SINCERE BLACK WOLF CRYER,**      )
)
        **Plaintiff,**      )
)
        **v.**      )        **Civil Action No. 11-10654-DJC**
)
**LUIS SPENCER et al.,**      )
)
        **Defendants.**      )
_____ )

## MEMORANDUM OF DECISION

**August 12, 2014**

## I.    INTRODUCTION

Plaintiff Derek Sincere Black Wolf Cryer ("Cryer"), an inmate at the Souza Baranowski Correctional Center ("SBCC") in Massachusetts, brings this action against Luis Spencer, former Commissioner of the Massachusetts Department of Correction; Thomas Dickhaut, former Superintendent of the SBCC; and Bruce Gelb, the SBCC's superintendent (collectively, "Defendants") seeking injunctive and declaratory relief for his claims that the Defendants violated his state and federal Constitutional rights.

Having held a bench trial over the course of three days between March 24, 2014 and May 20, 2014 as to the remaining claims in complaint, the Court now issues its findings of facts and conclusions of law.

## II.    PROCEDURAL HISTORY

On April 8, 2011, Cryer filed a complaint alleging violations of his rights under the Eighth and Fourteenth Amendments of the United States Constitution, Articles 1 and 26 of the Massachusetts Declaration of Rights and Title II of the Americans with Disabilities Act

("ADA"). D. 1. Cryer also alleged that the Defendants have violated Mass. Gen. L. c. 124, §

1(q), c. 30A, c. 111 §§2, 5, 20, 21, and c. 125, § 22, as well as 105 C.M.R. § 450.320, and sought

immediate and preliminary injunctive relief as well as a declaratory judgment that he be given

single cell status, that no inmate be placed in his cell and that he not be placed in any dormitory

housing unit. D. 1. Cryer moved for preliminary injunctive relief at the same time (as alleged in

the body of the complaint). D. 1. On April 27, 2011, the Court denied Cryer's request for

injunctive relief without prejudice to renew after the Defendants had filed a responsive pleading

or upon a motion filed in accordance with Fed. R. Civ. P. 65. D. 4 at 5. After the Defendants

moved to dismiss the complaint, D. 14, Cryer again sought a preliminary injunction. D. 21, 27.

The Court allowed in part and denied in part the motion to dismiss and denied the renewed

motion for a preliminary injunction. D. 30. That order dismissed Cryer's equal protection claim,

his ADA claim and his claims arising under state statutory and regulatory law. D. 30. The Court

subsequently denied Defendants' motion for summary judgment on the remaining claims arising

under federal and state constitutional law, D. 93, and held a bench trial on this matter, D. 97, 98,

106.

III.    **FINDINGS OF FACT**

In light of the evidence presented to the Court, the Court makes the following findings of

fact:

A.      **The Parties and Witnesses**

1.      Cryer is an inmate currently lawfully incarcerated at SBCC, a facility of the

Department of Correction, located in Shirley, Massachusetts. D. 1 at ¶ 1.

2.      At all relevant times, Luis Spencer was the Commissioner of the Department of

Correction, and is named as a defendant. Id. at ¶2.

3. At relevant times, Thomas Dickhaut was the Superintendent of SBCC, and was named as a defendant. Id. at ¶ 3.

4. Bruce Gelb is the Superintendent of SBCC, who acts as the chief administrative officer of the correctional facility. Trial Testimony of Bruce Gelb, Day 2, 40:13.[1] He has been Superintendent of SBCC since June 2012. Id. at Day 2, 40:21.

5. There are two deputy superintendents at SBCC: the Deputy Superintendent of Operations and the Deputy Superintendent of Classification and Programs, each of whom directly report to the Superintendent. Trial Testimony of Bruce Gelb, Day 2, 42:11-15.

6. Michael Rodrigues is the Deputy Superintendent of Classification and Programs at SBCC, and has served in this capacity since January 2009. Trial Testimony of Michael Rodrigues, Day 1, 105:25; Trial Testimony of Bruce Gelb, Day 2, 41:13-15. The responsibilities of this position include the oversight of inmate programs, housing, activities, religious services, and provision of medical and mental health services. Trial Testimony of Michael Rodrigues, Day 1, 106:3-7.

7. Dr. Johanna Shaw is a psychiatrist employed by the Department of Correction's contract medical provider, Massachusetts Correctional Partners in Health ("MCPH"). Trial Testimony of Johanna Shaw, Day 1, 4:17-19.

8. The Department of Correction has a contract with the MCPH to provide for the mental health needs of inmates. Trial Testimony of Michael Rodrigues, Day 1, 111:19-25.

---

[1] Final transcripts of the trial are not yet available. The Court relies upon the evidence presented at trial, draft transcripts of the trial and the parties' proposed findings of fact and conclusions of law, D. 102, 104, in arriving at its findings and conclusions. Citations to the draft transcripts are in the form "Day _, [page]:[line]."

9.      Deputy Superintendent Rodrigues is responsible for overseeing the provision of medical and mental health services to inmates at SBCC.  Trial Testimony of Michael Rodrigues, Day 1, 112:4-8.

10.     Donald Hager is the Mental Health Director at SBCC.  Trial Testimony of Bruce Gelb, Day 2, 48:13.

11.     Employees of MPCH are not employees of the Department of Correction.  Trial Testimony of Bruce Gelb, Day 2, 45:19-21.

**B.      SBCC Operations and Housing Policies**

12.     SBCC is a maximum-security correctional facility.  Trial Testimony of Michael Rodrigues, Day 1, 107:16-19.

13.     In 2009, SBCC became a double-bunked facility.  Trial Testimony of Bruce Gelb, Day 2, 56:5-8.

14.     SBCC currently contains cells that are double-bunked, as well as cells that are single-bunked.  Trial Testimony of Michael Rodrigues, Day 2, 3:12-20.

15.     Each general population housing unit at SBCC contains sixty-four (64) cells on two (2) tiers.  Trial Testimony of Michael Rodrigues, Day 2, 3:15-20.

16.     Thirty out of the thirty-two cells in the bottom tier of each general population housing unit at SBCC are double-bunked cells and are equipped to house two inmates in each cell.  Trial Testimony of Michael Rodrigues, Day 2, 3:15-20.  The remaining two cells on the bottom tier of each general population housing unit at SBCC are single-bunked, handicap-accessible cells.  Id.

17.     The thirty-two cells on the top tier of each general population housing unit at SBCC are single-bunked cells, i.e., they are equipped to house one inmate in each cell.  Trial Testimony of Michael Rodrigues, Day 2, 3:15-20.

18.     Although inmates newly assigned to a general population housing unit are housed in a double-bunked cell in the bottom tier of that unit, they can move up to an upper tier single-bunked cell based on good behavior and seniority.  Trial Testimony of Michael Rodrigues, Day 2, 6:11-7:2.

19.     Inmates in single cells on the top tier who have received a disciplinary report or do not comply with SBCC rules may be removed from the top tier and be placed in a double-cell on the bottom tier.  Trial Testimony of Michael Rodrigues, Day 2, 25:14-17.

20.     In addition to those inmates who are housed in single cells because of seniority and positive institutional adjustment, SBCC has designated certain inmates to be on "single cell status" or on the "single cell list," so that they are housed in single cells.  Trial Testimony of Michael Rodrigues, Day 2, 7:18-8:5.   These are "exceptions" to housing assignments for "extreme circumstances, or if medical or mental health deem it necessary."  Trial Testimony of Michael Rodrigues, Day 2, 7:18-20.

21.     Inmates who are housed in a single cell generally because of a mental health or medical condition, as opposed to those who are housed in a single cell based on seniority and positive institutional adjustment, are considered to be on "single cell status."  Trial Testimony of Michael Rodrigues, Day 1, 116:8-17.

22.     Unlike those inmates who are housed in single cells due to seniority and positive institutional adjustment, inmates on "single cell status" are not subject to double bunking at SBCC and do not lose their single cells when removed from the housing unit due to disciplinary action.  Trial Testimony of Michael Rodrigues, Day 2, 25:4-9.

23.     An inmate's designation as "single cell status" at SBCC does not necessarily follow an inmate if he transfers to another facility.  Trial Testimony of Michael Rodrigues, Day

2, 47:3-11. Rather, an inmate who was designated as being on "single cell status" at one correctional facility who is transferred to another correctional facility would likely have that status reevaluated by staff at the new facility. Trial Testimony of Michael Rodrigues, Day 2, 47:8.

24.     "Single cell status" is now only provided in rare instances and only when deemed necessary for the safe operation of SBCC. Trial Testimony of Michael Rodrigues, Day 2, 7:18-8:5.

25.     If an inmate at SBCC requests a single cell for mental health reasons, Deputy Superintendent Rodrigues would refer the request to mental health staff for their input. Trial Testimony of Michael Rodrigues, Day 2:14:21-15:8.

26.     If a mental health clinician concluded that an inmate required a single cell for mental health reasons, the mental health team would be consulted. If the mental health team recommended that an inmate should be in a single cell, it is likely that Deputy Superintendent Rodrigues would follow that recommendation. Trial Testimony of Michael Rodrigues, Day 1, 124:14-17.

27.     The responsibility for designating an inmate as being on "single cell status" is within the purview of Michael Rodrigues, SBCC's Deputy Superintendent of Classification and Programs and the assignment officers who report to him. Trial Testimony of Michael Rodrigues, Day 1, 118:19-25, 124:7-9.

28.     It is general practice at SBCC to follow the recommendations of the mental health department regarding housing assignments of inmates. Trial Testimony of Bruce Gelb, Day 2, 46:24-47:2.

29.     Superintendent Gelb has never disregarded a recommendation from mental health staff for a housing assignment.  Trial Testimony of Bruce Gelb, Day 2, 47:12-15.

30.     Superintendent Gelb did not order Deputy Superintendent Rodrigues to ignore a recommendation from mental health staff regarding any housing assignment.  Trial Testimony of Bruce Gelb, Day 2, 47:19-22.

31.     Deputy Superintendent Rodrigues has not overruled a recommendation from mental health staff for an inmate to be housed in a single cell.  Trial Testimony of Michael Rodrigues, Day 1, 115:4-7.

32.     In 2009, SBCC "underwent a mission change" and began the process of double-bunking so that offenders were expected to be assigned in two-person cells.  Trial Testimony of Michael Rodrigues, Day 1, 116:4-7.  During this conversion, the SBCC conducted a review of a list of approximately 250 or so inmates who, prior to the conversion, were given single-cell status, some of whom were given this designation because of mental health reasons.  Trial Testimony of Michael Rodrigues, Day 1, 116:18-117:1.

**C.  Cryer's Request to Remain on Single Cell Status**

33.     Cryer had been on the list of single cell status as "per Deputy Mendonsa," who was Mr. Rodrigues's predecessor as Deputy Superintendent of Classification and Programs, but there was no other reason listed for this status.  Trial Testimony of Michael Rodrigues, Day 2, 14:12.

34.     Deputy Superintendent Rodrigues conducted the review of all inmates at SBCC who were placed on the "single cell list" by his predecessor.  Trial Testimony of Michael Rodridgues, Day 1, 121:8-24.

35.     There were several reasons for this review.  First, with the number of inmates on that status, it became problematic to manage these assignments given the movement of prisoners

and bed space.  Second, inmates frequently requested to be placed on single cell status, and, due to the high number of inmates, it was important to assess whether there was a reason for a particular inmate to have a single-cell assignment.  Third, the count for the facility was high at that time, making institutional housing assignments more difficult.  Trial Testimony of Michael Rodrigues, Day 2, 11:3-12:6.

36.     At the time Deputy Superintendent Rodrigues and his staff conducted their review, 250 inmates were on single cell status, and, of this number, ninety-nine inmates were on single cell status and had either "per Deputy Superintendent Mendonsa" or "per Mental Health" as the reason listed as the basis for single cell status.  Trial Testimony of Michael Rodrigues, Day 1, 119:24-120:5.

37.     Deputy Superintendent Rodrigues and his staff reviewed the twenty-five inmates then housed at SBCC whose reasons for being on single cell status were "per Deputy Superintendent Mendonsa" or "per Mental Health."  Trial Testimony of Michael Rodrigues, Day 1, 121:8-15.

38.     Each of the inmate whose status was under review were notified of the review and were afforded the opportunity to convey any concerns or information that may be relevant to the review.  After this review, approximately twelve inmates were removed from this status, but thirteen remained in this status and the reasons for that continued status were better documented.  Trial Testimony of Michael Rodrigues, Day 1, 121:12-24.

39.     Deputy Superintendent Rodrigues stated that, for those inmates who were to remain on single cell status, the goal was to have a specific reason listed as the basis for their remaining on that status, as that information would help not only the current SBCC staff, but any subsequent Deputy Superintendent and his or her staff.  Trial Testimony of Michael Rodrigues, Day 1, 121:21-24.

40.     As part of this review, on March 11, 2013, Deputy Superintendent Rodrigues wrote to Cryer and informed him that he had been identified as being on the single cell list.  Trial Testimony of Michael Rodrigues, Day 2, 16:3; Trial Exhibit 8.

41.     Deputy Superintendent Rodrigues further stated in this correspondence that the list was being reviewed and it was possible that Cryer may be removed from the list, retain a single cell only at SBCC, or remain permanently on the single cell list.  Trial Exhibit 8.

42.     Deputy Superintendent Rodrigues requested that, if Cryer had specific information that he felt was relevant, he could submit this information to Mr. Rodrigues's office and it would be included during the review and decision.  Trial Exhibit 8.  Finally, Deputy Superintendent Rodrigues advised Cryer that he would be notified in writing as to the decision. Id.

43.     Deputy Superintendent Rodrigues testified that Cryer did not provide any information directly to him, but believed that he possibly provided information to the Assignment Officer.  Trial Testimony of Michael Rodrigues, Day 2, 17:11-18.

44.     After their review of all available information, SBCC's Director of Treatment and Director of Classification made the recommendation to Deputy Superintendent Rodrigues to take Cryer off of single cell status as he did not meet the criteria in terms of needing such status based upon mental or medical condition or as a means of the SBCC minimizing violence.   Trial Testimony of Michael Rodrigues, Day 2, 19:9-19.   Deputy Superintendent followed the recommendation and decided to remove Cryer from single cell status.  Trial Testimony of Michael Rodrigues, Day 2, 19:20-25.

45.     In making this decision, Deputy Superintendent Rodrigues did not consult with, or advise Commissioner Spencer or former Superintendent Dickhaut.   Trial Testimony of Michael Rodrigues, Day 2, 20:19-21:1.

46.     On July 21, 2013, Deputy Superintendent Rodrigues informed Cryer of this decision in writing.  See Trial Exhibit 7.  Specifically, Deputy Superintendent Rodrigues advised Cryer that his single cell status had been reviewed, and, after careful review, it had been determined that he did not have a medical, mental health, or security concern that required him to remain in a single cell.  Id.  Accordingly, the letter advised Cryer that he had been removed from the single cell list, effective immediately.  Id.

47.     Superintendent Gelb did not overrule Deputy Superintendent Rodrigues's decision to take Cryer off of single-cell status.  Trial Testimony of Bruce Gelb, Day 2, 49:19-21.

48.     Although Superintendent Gelb recalled having a conversation with Mental Health Director Hager regarding Cryer's request for a single cell in "the last couple of months" in which Director Hager informed him that there is no need, in his assessment, for Cryer to have a single cell, Trial Testimony of Bruce Gelb, Day 2, 48:12-49:4, Gelb did not recall any previous conversations with Hager about Cryer's single-cell status.  Trial Testimony of Bruce Gelb, Day 2, 48:25-49:4.

49.     Although Cryer is not on single cell status, he remains in a single bunked cell. The SBCC, however, could transfer him at any time to a double bunked cell.  Trial Testimony of Michael Rodrigues, Day 1, 117:2 -9.

**C.      Cryer and His Initial Mental Health Treatment at SBCC**

50.     Dr. Shaw is Cryer's psychiatrist and has treated him since 2009.  Trial Testimony of Johanna Shaw, Day 1, 5:20-23.  Of the mental health staff, Dr. Shaw has probably seen Cryer for the longest period of time and had the most involvement with him.  Testimony of Johanna Shaw, Day 1, 16:19-17:2.

51.     In Dr. Shaw's opinion, a diagnosis of psychosis and a serious history of aggression would probably warrant the placement of a patient in a single cell.  Trial Testimony of Johanna Shaw, Day 1, 12:18-24.

52.     Dr. Shaw opined that a diagnosis of schizophrenia does not, in itself, necessarily warrant a recommendation for a single cell.  Trial Testimony of Johanna Shaw, Day 1, 13:25-14:3.

53.     Dr. Shaw testified that inmate housing is not an issue for a psychiatrist unless the inmate is assessed as a danger to himself or others.  Trial Testimony of Johanna Shaw, Day 1:10:8-15.

54.     On September 16, 2009, after meeting with Cryer and evaluating him, Dr. Shaw found no evidence of either psychosis or suicidal or homicidal thoughts.  Trial Testimony of Johanna Shaw, Day 2, 46:14-22.

55.     On October 22, 2009, after meeting with him, Dr. Shaw found no evidence of either psychosis or homicidal ideation in Cryer.  Trial Testimony of Johanna Shaw, Day 1, 47:3-8.

56.     Dr. Shaw met with Cryer again on February 3, 2010, at which time, Dr. Shaw found no evidence of either psychosis or homicidal ideation in Cryer.  Trial Testimony of Johanna Shaw, Day 1, 49:21-25.

57.     After meeting with him on May 13, 2010, Dr. Shaw found no evidence of either psychosis or homicidal ideation in Cryer.  Trial Exhibit 6 (Exhibit F), Bates 261; Trial Testimony of Johanna Shaw, Day 1, 50:7-13.

58.     On June 17, 2010, after meeting with him, Dr. Shaw diagnosed Cryer with an Axis I adjustment disorder with anxiety and depression, as well as an Axis II personality disorder with schizotypal and paranoid features.   Trial Exhibit 6 (Exhibit F), Bates 262-263.

59.     Dr. Shaw concluded that, as of June 17, 2010, Cryer did not have a serious mental illness, and that, while he was struggling with symptoms of mental illness, medication could help him.  Trial Testimony of Johanna Shaw, Day 1, 21:9-23:11.

60.     On July 12, 2010, after meeting with him, Dr. Shaw found no evidence of psychosis or homicidal ideation and concluded that he was not suffering from a serious mental illness as defined by the Department of Mental Health.  Trial Exhibit 6 (Exhibit F), Bates 264-265.

61.     On August 12, 2010, after meeting with him, Dr. Shaw diagnosed Cryer with an Axis I psychosis, not otherwise specified, as well as an Axis II personality disorder with schizotypal and paranoid features and severe cognitive disorder, not otherwise specified, based on his statements that he was hearing voices.  Trial Exhibit 6 (Exhibit F_, Bates 266-267.

62.     The progress note states that "[t]he diagnosis is not clear," as Cryer "may have developed full-blown paranoid schizophrenia" or "may have a severe personality disorder (paranoid and schizotypal) and be under sufficient stress from the environment to have escalated to a brief psychotic episode."  Trial Exhibit 6 (Exhibit F), Bates 267.

63.     Dr. Shaw made this diagnosis of psychosis in August 2010 based upon Cryer's statements and in the absence of any psychological testing.  Dr. Shaw testified that her diagnoses are based, in part, upon the patients' subjective representations because they are able to do psychiatric evaluations, but do not have psychological testing available at SBCC.  Trial Testimony of Johanna Shaw, Day 1, 60:21-61:7.

64.     Dr. Shaw did not recommend at this time that Cryer be placed in a single cell and if, at any time, Dr. Shaw had been of the opinion that Cryer required a single cell, she would have conferred with the mental health team.  If the mental health team agreed that single cell status was warranted, they would discuss it with the mental health director.  If he agreed with the

recommendation, there would be a conference with the chief psychiatrist, the director of clinical programming and the mental health director. From that discussion, a single cell recommendation could be made to the DOC. Trial Testimony of Johanna Shaw, Day 1, 15:2-14.

**D. Cryer's Evaluation at Bridgewater State Hospital and Dr. Shaw's Change in Diagnosis**

65. In 2010, Cryer was thereafter admitted to Bridgewater State Hospital. Trial Testimony of Johanna Shaw, Day 1, 6:11-13.

66. Dr. Shaw relates that, at Bridgewater State Hospital, Cryer underwent psychological testing, which revealed that he had a paranoid personality disorder, but no anti-social tendencies. The testing also showed that he did not have a mood disorder, mania, psychotic thinking, but did have mild anxiety and depression. Trial Testimony of Johanna Shaw, Day 1, 32:16-23.

67. In light of the testing at Bridgewater State Hospital, although Dr. Shaw indicated that Cryer might do better in a single cell, she did not conclude that his mental status required such an assignment since he did not have a serious mental illness that would pose a danger to himself or another inmate. Trial Testimony of Johanna Shaw, Day 1, 34:3-14.

68. To the extent that Dr. Shaw had earlier diagnosed Cryer in August 2010 with psychosis, she concluded that such diagnosis, based upon his self-reported psychotic symptoms, was not supported based upon the psychological testing there and his denial of those symptoms during that evaluation. Trial Testimony of Johanna Shaw, Day 1, 13:8-19.

**E. Cryer's Continued Treatment at SBCC**

69. On September 30, 2010, after meeting with him, Dr. Shaw diagnosed Cryer with an Axis I panic disorder with agoraphobia and an Axis II personality disorder with schizotypal

and paranoid features and severe cognitive disorder, not otherwise specified. Trial Exhibit 6 (Exhibit F), Bates 270-271; Trial Testimony of Johanna Shaw, Day 1, 27:13-29:9.

70.     Dr. Shaw described panic disorder as a relatively mild condition, diagnosed by the recounting of symptoms that may not be true, which can be treated with medication, behavior modification, or cognitive behavioral therapy. She further states that a diagnosis of psychosis is more severe than a diagnosis of panic disorder. Trial Testimony of Johanna Shaw, Day 1, 30:13-23.

71.     In this note, Dr. Shaw stated her opinion that Cryer would do much better in a single cell in that he is otherwise likely to wind up in segregation or on mental health watch with daily crisis calls, which would not be helpful to him. Trial Exhibit 6 (Exhibit F), Bates 271. Dr. Shaw testified that Cryer would feel more comfortable in a single cell and that his mild anxiety may be reduced by a single cell, but there was no psychiatric necessity for a single cell. Trial Testimony of Johanna Shaw, Day 1, 31:23-32:8; Trial Exhibit 6 (Exhibit F), Bates 271.

72.     Dr. Shaw stated that there was no follow-up by Department of Correction staff after her September 10, 2010 progress note because the criteria for an mental health recommendation for a single cell is that the inmate is a danger to somebody else or himself as a direct result of a serious mental illness and she had concluded that this was not the case with Cryer. Trial Testimony of Johanna Shaw, Day 1, 35:9-19.

73.     During their January 19, 2011 meeting, Cryer told Dr. Shaw that he would harm any cellmate and that he cannot be held accountable due to mental illness. Trial Exhibit 6 (Exhibit F), Bates 274-275. Dr. Shaw stated that this behavior and statements about his intended behavior was goal directed, and not the product of mental illness. Trial Testimony of Johanna Shaw, Day 1, 63:15-64:7-11.

74.     Dr. Shaw stated that this behavior was an example of Cryer's ongoing catastrophic thinking, limited coping skills, and characterologic issues.  Trial Exhibit 6 (Exhibit F), Bates 275; Trial Testimony of Johanna Shaw, Day 1, 65:6-9.

**F.  Cryer's  Treatment from 2011 to Present**

75.     Dr. Shaw continued to treat Cryer throughout 2011 and into June 2012, and during their meetings, Cryer continued to request single cell status, as well as, on occasion, threaten any potential cellmate.  See Trial Exhibit 6 (Exhibit F), Bates 272-273 (3/23/11); 216-217 (8/15/11); 212-213 (12/19/11); 210-211 (2/29/12); 207-208 (5/21/12); 205-206 (6/13/12).

76.     On February 29, 2012, during their meeting, Cryer informed Dr. Shaw that, should he be transferred to medium security and be housed in a dorm or double cell, he claims he may end up hurting somebody, expects to end up in segregation in medium for six months, and end up being transferred back to SBCC.  Trial Exhibit 6 (Exhibit F), Bates 210-211.

77.     Dr. Shaw met with Cryer on February 6, 2013, after he had spent several months at Old Colony Correctional Center ("OCCC").  Trial Exhibit 6 (Exhibit F), Bates 203-204.  Dr. Shaw testified that she observed him to be calm and she saw no evidence of psychosis or anxiety.  Trial Testimony of Johanna Shaw, Day 1, 76:16-18.

78.     During this meeting, Cryer related that a cellmate was placed in his double cell in general population, that "[he] had to fight him," and that "[he] apologized, said it wasn't personal."  Trial Exhibit 6 (Exhibit F), Bates 203; Trial Testimony of Johanna Shaw, Day 1, 76:16-21.

79.     Dr. Shaw testified that, in her opinion, that Cryer assaulting his cellmate at OCCC was a way for him to attempt to get a single cell and not the product of mental illness, as Cryer apologized for his actions, and a patient with psychosis does not apologize for his actions,

but will attribute their actions to other forces (i.e. voices forcing him to act). Trial Testimony of Johanna Shaw, Day 1, 76:16-77:6.

80.     Dr. Shaw testified that, even when Cryer stated on March 4, 2013 that the voices were making him want to hurt others, she could find no objective evidence to support a diagnosis of psychosis. Trial Exhibit 6 (Exhibit F), Bates 201-202; Trial Testimony of Johanna Shaw, Day 1, 78:10-14.

81.     In the past, Dr. Shaw has consulted with the mental health directors stationed at SBCC, including John Beland and Hager, regarding Cryer's claims of needing a single cell due to mental illness. Trial Testimony of Johanna Shaw, Day 1, 6:17-20.

82.     Dr. Shaw has had no direct communication with Department of Correction personnel regarding Cryer. Trial Testimony of Johanna Shaw, Day 1, 7:2-6.

83.     Based on her comprehensive review of Cryer's entire medical and mental health file, Dr. Shaw determined that Cryer did not have psychosis and no serious mental illness, and she drafted a psychiatric reevaluation. Trial Testimony of Johanna Shaw, Day 1, 84:25-86:1; Trial Exhibit 6 (Exhibit F), Bates 276-80.

84.     In this reevaluation, Dr. Shaw states the following diagnostic conclusions with regard to Cryer:

> a. In response to underline external stress, patient experiences increased "anxiety," distrust, physical symptoms and hypervigilance due to a paranoid character disorder. He blames others. These symptoms do not equate with psychosis. He did not have typical anxiety symptoms in childhood or adolescence. It is only within the restrictive environment of prison that he has become symptomatic. As he has a life sentence, the stressor is chronic. The more appropriate diagnosis therefore is Adjustment Disorder with anxiety, chronic.
>
> b. Patient does not have a significant cognitive problem. He does process information better when it is presented visually, rather than by spoken word. He functions in the low average or average range.

c. He exaggerates his symptoms, for secondary gain (currently, obtaining a single cell). He is rigid in his approach. This is a conscious decision on his part.

d. Due to his goal-directed presentation, diagnosis based solely on his subjective report is unreliable. Therefore the diagnosis of panic disorder with agoraphobia is discarded. He has not had spontaneous panic attacks. And these anxiety attacks are triggered by anxiety about having to accept a cellmate. They are for secondary gain. In that respect they do not interfere significantly with his function. He is able to go to areas where multiple people congregate. And indeed has had leadership positions in groups. He goes to Chow Hall, Gym and Yard. He is seen as calm, smiling, socially engaged with peers in hallways. He pursues grievances and legal concerns in an organized fashion.

e. He does not constitute a danger to himself or others based on a serious mental illness or delusion. In fact his antisocial scale on testing is <u>not</u> elevated.

f. He does not qualify for mental health exemption to double bunking, and has been told repeatedly that it's a security issue and DOC decision.

Trial Exhibit F, Bates 276-280 (underlining in original). In the Re-Evaluation, Dr. Shaw diagnoses Cryer as follows:

AXIS I:    History of polysubstance dependence.
           Adjustment disorder with anxiety, chronic.
AXIS II:  Paranoid personality disorder.
AXIS III: Allergy:  NKDA
           History of head trauma with orbital fracture, and unilateral ptosis.
           History of knee surgery.

Trial Exhibit F, Bates 276-280.

85.    On November 26, 2013, Dr. Shaw entered a diagnostic change form, changing Cryer's Axis I diagnosis from "300.21 Panic Disorder with Agoraphobia" to "Adjustment Disorder With Anxiety, Chronic 309.24." Trial Exhibit 6 (Exhibit F), Bates 281. The Axis II diagnosis of paranoid personality disorder, severe remained the same. <u>Id.</u>

86.    A doctor's diagnosis of a patient can change over time and Dr. DiCataldo described it as a common occurrence, particularly in light of new information. Trial Testimony

of Frank DiCataldo, Day 2, 102:6-14. Although he acknowledged that it is true that people make adjustments in diagnoses, he opined that it was more uncommon, although not unheard of, to have a complete revision of a diagnosis. Trial Testimony of Frank DiCataldo, Day 2, 128:14-17.

87. A psychologist would consider a patient's medical records, reports of third-party sources and psychological testing in formulating a diagnosis. Trial Testimony of Frank DiCataldo, Day 2, 103:15-20.

88. Dr. DiCataldo noted that psychological testing can confirm or contradict a diagnosis and, therefore, might cause him to go back and reconsider a diagnosis. Trial Testimony of Frank DiCataldo, Day 2, 104:20-25.

89. While he was removed from single cell status, Cryer has remained housed by himself at SBCC due to his being disciplinary report-free. As he has been abiding by the rules, Deputy Superintendent Rodrigues has seen no reason to double-bunk him. Should Cryer's behavior change and he incur a disciplinary report, he will be double-bunked. Trial Testimony of Michael Rodrigues, Day 2, 21:23-22:6.

## IV. CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

### A. The Eighth Amendment and Cryer's Claims

1. In the complaint, Cryer alleged that Defendants denied him his Eighth Amendment right to imprisonment free from cruel and unusual punishment by refusing his request to be granted "single cell status." D. 1 at ¶ 18.

2. To succeed on an Eighth Amendment claim in this context, a prisoner must demonstrate that the Defendants have acted with "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976).

3.     This standard requires prisoners to satisfy both subjective and objective inquiries. Leavitt v. Corre. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011).  As to subjective component, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994); Leavitt, 645 F.3d at 497 (quoting Farmer).  That is, an inmate must show that a prison official knew that he "face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it."  Farmer, 511 U.S. at 847.  As to the objective component, that of serious medical need, the First Circuit has held that "a medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Leavitt, 645 F.3d at 497(quoting Guadreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990)); see  Mahan  v. Plymouth Cnty. House of Corr., 64 F.3d 14, 18 (1st Cir. 1995).

4.     Under this standard, an inmate does not have the right to the "treatment of his choice."  Jackson v. Fair, 846 F.2d 811, 817 (1st Cir. 1988).  However, inmates may not be denied adequate medical care as a result of deliberate indifference.  Estelle, 429 U.S. at 104.

5.     The practice of double bunking is not *per se* unconstitutional.  Rhodes v. Chapman, 452 U.S. 337, 347-48 (1981).  However, the First Circuit has acknowledged that "in rare cases [the policy of double bunking] might amount to an unlawful practice when combined with other adverse conditions."  Cote v. Murphy, 152 Fed. App'x 6, 7 (1st Cir. 2005); see also Rector v. Dept. of Corr., 387 Fed. App'x 5, 6 (1st Cir. 2010) (suggesting that double bunking is unconstitutional when it causes a risk to an inmate's personal safety).

6.     The parties agree that the standard applicable to Cryer's Eighth Amendment claims also applies to Cryer's remaining claims under the due process clause and the Massachusetts Declaration of Rights.  D. 93 (citing D. 87 at 13-14; D. 90 at 11 and cases cited).

7.     In the prison context, the substantive due process clause affords convicted prisoners no greater protection than does the cruel and unusual punishment clause under the Eighth Amendment.  Whitley v. Abers, 475 U.S. 312, 327 (1986).  Where, as here, his claim is "covered by a specific constitutional provision, such as the . . . Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  United States v. Lanier, 520 U.S. 259, 272 n.7 (1997).

8.     The protected liberty interests under Article 1 of the Massachusetts Declaration of Rights have been compared to the due process clause of the Fourteenth Amendment.  See, e.g., Hudson v. Comm'r of Corr., 46 Mass. App. Ct. 538, 543 (1999).  Moreover, a similar standard applies to claims under Article 26 of the Massachusetts Declaration of Rights as those claims asserted under the Eighth Amendment.  Torres v. Comm'r of Correction, 427 Mass. 611, 615-16 (1998).

9.     Because virtually the same standards apply to Cryer's Eighth Amendment claim, his substantive due process claim and his claim under the Massachusetts Declaration of Rights, the Court applies the "deliberate indifference" standard to all of Cryer's claims.  D. 87 at 13-14; D. 90 at 11.

**B.     Cryer Failed to Meet His Burden to Show Deliberate Indifference**

10.     Cryer has failed to present evidence that meets his burden as to the elements of his Eighth Amendment claim, or, by extension, to his other federal and state constitutional claims.

11.     The only evidence that Cryer has presented of his serious medical need are the medical records of Dr. Shaw who testified at trial.  Dr. Shaw testified that she would recommend that an inmate be placed on single cell status if the inmate exhibited a serious mental illness that posed a danger to the inmate or others.

12.     There was no suggestion in Dr. DiCataldo's testimony that he ever examined Cryer personally; rather, he relied only on medical records of Dr. Shaw and other treating clinicians.  Trial Testimony of Frank DiCataldo, Day 2, 81:13-17; see generally Trial Testimony of Frank DiCataldo, Day 2.  Dr. DiCataldo did not opine about Cryer's mental condition.  Id. Further, there is no evidence presented in Dr. DiCataldo's testimony that he disagreed with Dr. Shaw's conclusions about when single cell status is warranted as a result of a serious mental illness or whether a single cell was not warranted based upon Cryer's mental health condition. Id.

13.     Dr. DiCataldo has never rendered an opinion regarding whether an inmate should be placed in a single cell due to mental health reasons.  Trial Testimony of Frank DiCataldo, Day 2, 98:10-21.

14.     Although Dr. Shaw's prior August 2010 progress note had included a diagnosis of psychosis for Cryer, even at the time of that diagnosis, she noted that this diagnosis was " not clear" as his condition at the time might have been paranoid schizophrenia or may have been a severe personality disorder or a brief psychotic episode in response to environmental factors, the latter two of which would not constitute serious mental illness in Dr. Shaw's opinion.  Trial Exhibit 6 (Exhibit F), Bates 267.  Dr. Shaw's later revision of this diagnosis was in light of additional information including psychological testing, previously unavailable to her, that was not consistent with a diagnosis of psychosis.

15. The revised diagnosis of adjustment disorder was more consistent with Dr. Shaw's earlier evaluations and there is no evidence in the record that such diagnosis amounted to a serious mental illness or that, as result of any serious mental illness, Cryer posed a threat to himself or others.

16. Accordingly, Cryer did not establish that he had a "serious medical need" to be placed on single cell status. Mahan, 64 F.3d at 18. That is, he did not present evidence to meet his burden on the objective prong of the Eighth Amendment analysis.

17. Cryer also failed to meet the subjective prong of the Eighth Amendment analysis. Both Superintendent Gelb and Deputy Superintendent Rodrigues testified that they would likely place an inmate on single cell status if they received a recommendation from the DOC's mental health contractor for such designation based upon their assessment of an inmate's mental health.

18. Neither official ever received such a recommendation from Dr. Shaw or any other mental health professionals for single cell status for Cryer. In the absence of such recommendation from mental health staff, and in the absence of objective evidence that Cryer's mental health status necessitated such status, the Court cannot conclude that they acted with "deliberate indifference" in denying Cryer single-cell status.

19. Moreover, the Court notes that the record reflects that Cryer has received ongoing mental health treatment, including but not limited to treatment and evaluation by Dr. Shaw. He has not received the single cell status which he seeks, but the record does not support a finding that such status is warranted as a matter of his mental health. That is, Cryer has received the mental health treatment that the mental health team has deemed to be warranted, but not the treatment that he seeks.

20.     Cryer also did not produce any evidence with respect to any actions by Defendants Luis Spencer or Thomas Dickhaut as to his single cell status. Accordingly, there were no set of facts presented to the Court upon which these Defendants are liable for any alleged constitutional violations.

## V.     CONCLUSION

After consideration of the evidence presented at trial and in light of the aforementioned findings of fact and conclusions of law, this Court enters judgment in favor of the Defendants on the remaining claims (namely, the constitutional claims for violation of the prohibition against cruel and unusual punishment and due process arising under the Eighth and Fourteenth Amendments and the Massachusetts Declaration of Rights, Articles 1 and 26). To the extent that Cryer seeks injunctive relief, that relief is DENIED in light of the Court's decision.

**So ordered.**

/s/ Denise J.  Casper
United States District Judge